IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TERESA L. BALDWIN,**

       **Plaintiff,**

                                  **Civil Action 2:12-cv-298**

   **v.**                                  **Judge Michael H. Watson**

                                  **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Amended Statement of Errors, the Commissioner's Memorandum in Opposition to the Plaintiff's Statement of Errors, Plaintiff's Reply, and the administrative record.  (ECF Nos. 20, 15, 21, 8.)   For the reasons that follow, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff filed her application for benefits on June 2, 2008, alleging that she has been disabled since April 6, 2007, at age 52.  (R. at 124.)  Plaintiff alleges disability as a result of bipolar disorder.  (R. at 146.) Plaintiff's application was denied initially and upon reconsideration.  (R. at 1-4, 49-52.)  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").  (R. at 50-60.)

ALJ Timothy G. Keller held a hearing on August 12, 2010, at which Plaintiff, represented by counsel, appeared and testified. (R. at 26-46.) William Keiger, a Vocational Expert, also appeared and testified at the hearing. (R. at 38-46.) On September 24, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 8-19.) On February 8, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-4.) Plaintiff thereafter timely commenced the instant action.

## II. HEARING TESTIMONY

### A.     Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she last worked on April 6, 2007. (R. at 28.) She testified that she was collecting unemployment benefits from 2007 through May 2010. *Id.* According to her testimony, Plaintiff made herself available for work and looked for a job during that period. (R. at 29.) She stated that if she would have received a job offer during that period, she would have accepted it.

Nevertheless, Plaintiff stated that she would have "a lot of trouble" if she were to go back to work. *Id.* She stated that she could not keep up the pace, because she can no longer function and think as she used to. (R. at 30.) She testified that she experiences difficulty concentrating. (R. at 32.) She stated that she has difficulty picking out groceries and adding up the cost of items. (R. at 31.) She testified that she gets lost when she leaves the house, and that sometimes she experiences episodes in which she blacks out. (R. at 32.)

Plaintiff testified that she has a high school diploma. (R. at 33.) She indicated during the hearing that she took special education classes in high school. The ALJ pointed out that Plaintiff's final class rank was 66 out of 88 students, and that her school records showed that she

2

took English, spelling, science, math and social studies.  *Id.*  Plaintiff testified that a "special teacher" would come into her class and teach the courses.  (R. at 34.)  She subsequently clarified that she received "special help" from teachers during school hours.  *Id.*

Plaintiff testified that she sees a mental health professional who prescribes medication for her condition.  (R. at 30.)  She also indicated that she treats with a therapist on a bi-weekly basis.  She stated that she had a six-month period after her alleged onset-date in which she possessed the ability to think clearly.  (R. at 36.)  She stated that her doctor told her that her medication contributed to her lack of clarity in thought.  (R. at 37.)

**B.     Vocational Expert Testimony**

William Kieger testified as the Vocational Expert ("VE") at the administrative hearing. (R. at 38-46.)  The ALJ asked the VE to assume that an individual suffered no exertional limitations and that she was able to understand, remember and carry out simple tasks and instructions; maintain concentration and attention for two-hour segments in an eight-hour work day; respond appropriately to supervisors and coworkers in a task-oriented setting with infrequent and casual contact with others; and adapt to simple changes and avoid hazards.  (R. at 38.)  Under those circumstances, the VE testified that such an individual could perform all of Plaintiff's previous work experience, which includes positions as a power drill operator, press operator, and warehouseman.

On cross-examination, Plaintiff's counsel asked the VE to further assume that the hypothetical individual required explanations in very simple, concrete terms, as well as repeated demonstrations as to tasks.  (R. at 39.)  The VE testified that such a restriction would not prevent the individual from competitive work so long as the repeated demonstrations were part of the new-hire process.  If, on the other hand, the person required repeated demonstrations beyond

starting and learning the new job, she would require an accommodation.  He further testified that if the individual were off-task twenty-five percent of the time, she would be precluded from competitive employment.  (R. at 44.)

## III. MEDICAL RECORDS

### A.     Central Ohio Mental Health Center

The record contains treatment notes from Central Ohio Mental Health Center from as early as 2003.  The record indicates that Plaintiff saw various professionals at Central Ohio Mental Health Center who prescribed medication to control her mental health condition.  On July 9, 2003, it was noted that Plaintiff suffers from auditory and visual hallucinations, and that she was hospitalized twelve years prior.  (R. at 268.)  She was diagnosed with a psychotic disorder not otherwise specified, and potential paranoid schizophrenia.  *Id.*

On September 4, 2007, Plaintiff presented requesting a note stating that she could return to work.  (R. at 244.)  The mental-health professional who evaluated Plaintiff noted that she displayed less difficulty adjusting her body position than she had during previous visits; but that she displayed more involuntary movements such as tongue-thrusting and jaw rotation.  The professional prescribed antipsychotic medication.

On October 30, 2007, Plaintiff reported that she was doing "so good – real good."  (R. at 238.)  She reported feeling more alert and coherent.  Her affect was noted as "objectively a bit flat" and "constricted."  *Id.*  Her insight and judgment were noted to be "fair at best."  *Id.*

On December 20, 2007, Plaintiff reported that her new medication was working well.  (R. at 242.)  She reported that she doesn't "feel like [she's] being invaded by spiritual things."  *Id.*  She was seen again on March 20, 2008, and reported that she was "doing fine."  (R. at 233.)  The professional who evaluated her noted her mood as "fair."

On June 12, 2008, Plaintiff again went to Central Ohio Mental Health Center. (R. at 334.) She reported a minor increase in energy with a recent change in medication. She indicated that she had not been seeing a therapist, but that she would accept a referral. On August 5, 2008, she reported a minor increase in energy and sense of well-being. (R. at 329.) On June 18, 2008, she reported struggling with not having been able to work. (R. at 333.)

The record indicates that on March 25, 2009 Plaintiff started to see Deb Marshall, Certified Nurse Practioner ("CNP") at Central Ohio Mental Health. (R. at 373.) On March 25, 2009, Plaintiff reported her mood as stable. CNP Marshall noted that Plaintiff appeared "a bit disheveled," and that she had "a bit of an odd, blank stare." *Id.*

Plaintiff saw Nurse Marshall again on May 20, 2009. (R. at 371.) She stated that one of her medications was causing her to have vivid dreams. She indicated that she did not want to continue taking that medication. CNP Marshall noted that Plaintiff had an "[o]dd blank stare." *Id.*

Plaintiff again reported to CNP Marshall on August 5, 2009 that she was doing well, and denied continued problems with sleep or mood. (R. at 369.) She next visited CNP Marshall on October 28, 2009. (R. at 367.) Plaintiff stated that she felt "pretty good," and reported her mood as stable. CNP Marshall noted that Plaintiff's thought content appeared somewhat impoverished. She noted her thought process as mildly slow with delayed responses.

At her January 21, 2010 appointment with CNP Marshall, Plaintiff denied feeling depressed or anxious, and reported that she had been doing well. (R. at 365.) She reported low energy and stated that she sleeps 8-10 hours per night and then naps for one to two hours per day. CNP Marshall noted Plaintiff's thought process as "mildly slowed" with a lack of spontaneous thought. *Id.*

5

On March 25, 2010, Plaintiff reported that she began to feel "funny" earlier that morning. (R. at 363.) She reported feeling "mentally clouded" and experiencing problems with her memory. She indicted that she had been experiencing instances in which she cannot account for prior periods of time. CNP Marshall recommended that she go to the emergency room for evaluation. *Id.*

**B.**     **Marion General Hospital**

Plaintiff presented to the emergency room on August 5, 2007, complaining that she feels "like [she is] going to burst into flames." (R. at 247.) She reported hearing voices, receiving various messages from the television and radio, and feeling paranoid. Plaintiff denied suicidal or homicidal thoughts. Doctors noted that Plaintiff has a history of schizoaffective disorder. (R. at 253.) Plaintiff reported that professionals at Central Ohio Mental Health had recently changed her medication. She also admitted to using "street drugs." *Id.* The attending physician described Plaintiff as "acutely psychotic, frightened, disorganized, [and] emotionally labile." *Id.* She was diagnosed with schizoaffective disorder, substance abuse disorder, and mixed character disorder. Doctors assigned her a GAF score of 15.[1] She was admitted and underwent individual and group therapy, milieu management, and occupational therapy. (R. at 255.) Plaintiff remained in the hospital until her August 13, 2007 discharge. *Id.*

**C.**     **Deb Marshall, CNP**

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 15 is indicative of some danger of hurting one's self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute). DSM-IV-TR at 34.

On April 2, 2010, Deb Marshall, CNP prepared a statement concerning Plaintiff's mental impairments. (R. at 360.) Ms. Marshall opined that Plaintiff suffers marked impairment in her ability to maintain attention and concentration for two hour time-periods. She indicated that Plaintiff suffers from poor attention and focus, that she is easily distracted, and that she has "slowed cognition." *Id.* Ms. Marshall further opined that Plaintiff suffers marked impairment in her ability to interact appropriately with others. (R. at 361.) She indicated that Plaintiff becomes "highly anxious around strangers," and that she "tends to withdraw as a result." *Id.* Ms. Marshall opined marked impairment in Plaintiff's ability to withstand the stresses and pressures of routine, simple, unskilled work. She indicated that although Plaintiff's psychiatric state is stable with a stable environment, she is likely to decompensate with increased stress and pressure. She described Plaintiff's condition as "fragile." *Id.* Ms. Marshall further opined that Plaintiff suffers marked impairment in her ability to make judgments commensurate with the functions of unskilled work, such as the ability to make simple, work-related decisions. *Id.* She reported that Plaintiff suffers from an "impaired, superficial and slowed throught process," and that her thought content is impoverished. *Id.* Ms. Marshall concluded that Plaintiff's psychiatric state would prevent her from sustaining full-time as well as part-time employment. *Id.*

**D.    Richard Litwin, Ph.D.**

On January 10, 2008, Dr. Richard Litwin examined Plaintiff on behalf of the state agency. (R. at 284-91.) Plaintiff reported that she was diagnosed with a psychotic disorder in 2008. She indicated that she experiences "racing thoughts, visual hallucinations[, and] premonitions of things that will happen in the future." *Id.*

Upon administering the Wechsler Adult Intelligence Test-III, Dr. Litwin noted that Plaintiff's verbal IQ placed her in the range of mild mental retardation; her performance IQ

7

placed her in the borderline range; and her full scale IQ placed her in the range of mild mental retardation. (R. at 285.) Plaintiff scored at the fifth-grade level in word reading, spelling, and reading rate. *Id.* She scored at the fourth-grade level in calculations and reading accuracy. She scored at the third-grade level in reading comprehension.

Dr. Litwin diagnosed Plaintiff with a psychotic disorder not otherwise specified and mild mental retardation, and assigned her a GAF score of 68.[2] He opined that Plaintiff is best suited for low-skilled, trade-oriented work involving hands-on learning. (R. at 287.) He further indicated that Plaintiff will work better with objects or tools than people, and that she should not be expected to assume much responsibility or decision making. In addition, Dr. Litwin opined that Plaintiff "would need to avoid jobs that involve much reading, writing or working with figures or operating a cash register." *Id.* He further indicated that "[s]he will need directions explained in very simple[,] concrete terms coupled with demonstration and repetition." *Id.*

**E.     Marva Dawkins, Ph.D.**

On July 18, 2008, Dr. Dawkins reviewed Plaintiff's records on behalf of the state agency. (R. at 299-312.) She noted that Plaintiff alleges that she suffers from bipolar disorder, but that she had reported an increase in energy on June 18, 2008. (R. at 311.) She opined that Plaintiff suffers moderate limitations in her ability to understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers; and respond

---

[2] A GAF score of 68 is indicative of some or mild symptoms or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, with the ability to have some meaningful interpersonal relationships. DSM-IV-TR at 34.

appropriately to changes in the work setting. (R. at 295-96.) Other than those restrictions, Dr. Dawkins concluded that Plaintiff is not significantly limited in her ability to function.

Dr. Dawkin found Dr. Litwin's opinion to be fairly consistent with other evidence in the file. Dr. Dawkin accorded weight to Dr. Litwin's determination that Plaintiff is able to perform low-skilled work that does not involve much contact with others, reading or writing, or working with figures or operating a cash register. *Id.* In another section of her assessment, Dr. Dawkin noted that Plaintiff "retains the mental capacity to perform and sustain simple routine work[-]related tasks and activities in a work setting where she would have minimal contact with supervisors, coworkers and the general public." (R. at 297.)

## IV. THE ADMINISTRATIVE DECISION

On September 24, 2010, the ALJ issued his decision. (R. at 8-19.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of April 6, 2007. (R. at 10.) The ALJ found that Plaintiff suffered from the severe mental impairment of bipolar disorder. *Id.* He further found that Plaintiff did not have an impairment or combination of impairments that met or medically

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.) At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ found:

> The claimant has the residual functional capacity to perform work at all levels of physical activity, with the exception that she is limited to understanding, remembering, and carrying out simple tasks and instructions for two hours periods [sic] of time throughout an eight hour work day, which involves only casual and infrequent contact with supervisors and coworkers in a task oriented setting. This residual functional capacity is consistent with the opinions of Dr. Litwin and Dr. Dawkins, and it is well-supported by the record as a whole.

(R. at 14.) In reaching this determination, the ALJ found the opinions of Drs. Litwin and Dawkins "consistent with and well-supported by the objective medical evidence," and he accepted them "as an accurate representation of the claimant's status." *Id.*

Relying on the VE's testimony, the ALJ determined that Plaintiff could perform her past relevant work experience as a drill operator, press operator, and warehouse worker. (R. at 18.) Accordingly, the ALJ concluded that Plaintiff is not disabled within the meaning of the Social Security Act. (R. at 20.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. LEGAL ANALYSIS

In her Statement of Errors, Plaintiff raises numerous challenges to the ALJ's decision. (Statement of Errors, ECF No. 20.)  Among the challenges she raises, Plaintiff contends that the ALJ failed to incorporate all of the relevant mental limitations into his RFC analysis.  *Id.* at 19-

20. The Undersigned agrees, and concludes that the ALJ committed reversible error in failing to incorporate all of the mental limitations that he accepted into his RFC.[3]

A.     **Residual Functional Capacity**

Residual functional capacity ("RFC") is an assessment of the most a claimant can still do despite his or her limitations.  20 CFR § 404.1545(a).  A claimant's RFC is used to assess whether that claimant can perform past relevant work and whether the claimant can adjust to other work.  20 C.F.R. § 404.1520(a)(4).  In assessing a claimant's RFC, the ALJ must consider "all relevant evidence and findings regarding an individual's work related limitations."  *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450**,** 452 (6th Cir. 2007); *see also Thompson v. Astrue*, No. 3:10–cv–01688**,** 2011 WL 3298904, at *12 (N.D. Ohio Aug. 2, 2011) ("Clearly, significant limitations in a claimant's mental work capabilities must be accurately accounted for if an RFC finding is to be supported by the record as a whole.").

An RFC includes an assessment of a claimant's mental abilities and limitations.  20 C.F.R. § 404.1545(c).  Notably, limitation categories within the "paragraph B criteria" are not equivalent to a mental RFC assessment.  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  Instead, a mental RFC "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph[] B."  *Id.*  Examples of limitations that may reduce a claimant's ability to work include "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting . . . ."  20 C.F.R. § 404.1545(c).

---

[3] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  The Undersigned need not, and does not, resolve the alternative bases that Plaintiff asserts support reversal and remand.

Relatedly, in complex cases, an ALJ may choose to rely on vocational expert testimony "given the [vocational expert's] ability to tailor [his or] her finding to an individual's particular residual functional capacity." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) (internal quotations omitted). In such situations, the ALJ will ask the vocational expert hypothetical questions reflecting potential RFC determinations. For vocational expert testimony to serve as substantial evidence in support of the ALJ's decision, a hypothetical question "must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Consequently, various federal courts, including the Court of Appeals for the Sixth Circuit, have found hypothetical questions inappropriate when they fail to fully account for a plaintiff's mental limitations. *See, e.g.*, *id.* (hypothetical question limiting a person to simple, repetitive tasks, in a non-public setting, did not account for psychological consultant's conclusion that limited the plaintiff to "[two-hour] segments over an eight-hour day where speed was not critical"); *Ball v. Comm'r of Soc. Sec.*, No. 1:09-cv-684, 2011 WL 765978, at *4 (S.D. Ohio Feb. 25, 2011) (finding that an ALJ's hypothetical question limiting a plaintiff to low stress jobs; simple, routine, repetitive tasks; and no fast-paced production requirements, "incorporated some but not all of the moderate limitations the ALJ found to exist"); *Renn v. Comm'r of Soc. Sec.*, No. 1:09-CV-319, 2010 WL 3365944, at *6 (S.D. Ohio Aug. 24, 2010) (holding that an RFC limiting Plaintiff to simple, routine repetitive tasks; occasional interaction with public; and only routine changes in work setting, did not properly account for the plaintiff's moderate deficits in memory, attention, and concentration).

Here, the ALJ relied on the vocational expert's testimony to conclude that Plaintiff can perform her past work as a power drill operator, press operator, and warehouseman. (R. at 18.)

13

The hypothetical question the ALJ presented to the VE mirrored the RFC the ALJ assigned in his written opinion. The ALJ included in his RFC and the hypothetical question limitations concerning Plaintiff's ability to understand, remember, and carryout simple tasks and instructions for two-hour periods of time, as well as her ability to engage in more than casual or infrequent contact with supervisors and coworkers. (R. at 14.) The ALJ also included restrictions based on Plaintiff's ability to work in a task-oriented setting. *Id.* The ALJ failed to include in the RFC assessment, however, and consequently in his hypothetical questions to the VE, limitations related to Plaintiff's ability to read, write, work with figures, and operate a cash register, as well as her need for very simple and concrete directions coupled with repeated demonstration and repetition. *Id.* These restrictions were included in Dr. Litwin's RFC assessment, which the ALJ accepted as "consistent with and well-supported by the objective medical evidence and . . . as an accurate representation of [Plaintiff's] status." (R. at 14.) With the exception of the need for repeated demonstrations, these restrictions were also noted in Dr. Dawkins assessment, which the ALJ likewise accepted.[4] *Id.* Although the ALJ accepted both of these opinions, he failed to include in his RFC all of the limitations contained within them. Nor did he provide a reason for omitting these restrictions. Accordingly, the Undersigned cannot conclude that the ALJ's opinion is supported by substantial weight because his RFC does not account for all the limitations that he accepted.

      Defendant's argument to the contrary is not well taken. Defendant posits that Plaintiff could perform her past relevant work even if all the relevant restrictions were included in the RFC. (Op. 13, ECF No. 15.) To support her position, she points to a function report that

---

[4] It is unclear from the record why Dr. Dawkin adopted all of Dr. Litwin's restrictions except the need for repeated demonstrations. Dr. Dawkin does not mention the restriction regarding repeated demonstrations, which suggests that he may have overlooked it. (R. at 297.)

Plaintiff completed regarding her position as a warehouseman. *Id.* In that report, Plaintiff indicated that her warehouseman position required neither technical knowledge and skills, nor "writing, completing reports, or perform[ing] duties like this." *Id.* (citing R. at 147.) According to Defendant, "Plaintiff's description of her job duties indicate that she did not do much reading or writing, working with figures, or operat[ing] a cash register." *Id.* Thus, Defendant concludes that Plaintiff is capable of performing her past relevant work.

Defendants' conclusion is speculative at best, and cannot be reached based on the record before the Court. In the function report upon which Defendant relies, Plaintiff also indicated that as a warehouseman she spent two hours per day "writ[ing], typ[ing] or handl[ing] small objects." (R. at 147.) She also indicated that she was a "lead worker," and that she supervised four employees. (R. at 148.) Even without the benefit of expert testimony, it would appear that these aspects of Plaintiff's position as a warehouseman are inconsistent with the limitations set forth in the opinions of Drs. Litwin and Dawkins. Moreover, the ALJ and not this Court must decide whether Plaintiff is capable of performing her past relevant work. But the ALJ must take into account all of Plaintiff's limitations when he does so. The ALJ failed to do so here.

Based on the foregoing, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

## VII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

15

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 22, 2013                    /s/ *Elizabeth A. Preston Deavers*
                                       Elizabeth A. Preston Deavers
                                       United States Magistrate Judge